ALBERT MOTYKA, *ET AL.*, PLAINTIFFS-APPELLANTS, v. LLOYD McCORKLE, *ETC.*, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued February 9, 1971—Decided April 5, 1971.

Mrs. *Ann Mufson* argued the cause for appellants (*Mr. Peter M. Siegel,* Administrator, Middlesex County Legal Services, attorney; *Mr. Peter M. Siegel* and *Mr. Michael Parks,* of counsel and on the brief).

Mr. *Stephen Skillman,* Assistant Attorney General, argued the cause for respondents (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Daly D. E. Temchine* and *Mr. Alfred L. Nardelli,* Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

JACOBS, J. The plaintiffs instituted a proceeding in the Chancery Division attacking the validity of Section 615A of the Categorical Assistance Budget Manual of the Division of Public Welfare, Department of Institutions and Agencies. The matter was transferred to the Appellate Division and we certified before argument there.

Public Welfare in New Jersey is administered through various avenues including so-called categorical assistance programs which are encouraged and partly financed by the federal government. The best known of these programs is the one for Aid to Families with Dependent Children (AFDC). It was part of the Social Security Act of 1935 and its history is adequately set forth in *King v. Smith,* 392 *U. S.* 309, 88 *S. Ct.* 2728, 20 *L. Ed.* 2d 1118 (1968); *Rosado v. Wyman,* 397 *U. S.* 397, 90 *S. Ct.* 1207, 25 *L. Ed.* 2d 442 (1970); *Dandridge v. Williams,* 397 *U. S.* 471, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491 (1970). Though not obliged to participate in the AFDC program, New Jersey elected to do so in *L.* 1959, *c.* 86 (*N. J. S. A.* 44:10–1 *et seq.*) and adopted a plan which received the approval of the Secretary of Health, Education and Welfare as a prerequisite to the availability of federal funds.

*L.* 1959, *c.* 86 did not endeavor to fix the standards of need or the level of benefits but left these matters, along

with most other matters, to administrative regulation. Thus the Commissioner of Institutions and Agencies was authorized and directed, under general policies established by the State Board of Control, to issue "all necessary rules and regulations and administrative orders," and, stressing the legislative goal to obtain maximum federal funding, the Commissioner was authorized and directed to do all things "necessary to secure for the State of New Jersey the maximum Federal financial participation that is available with respect to a program of assistance for dependent children . . . ." *L.* 1959, *c.* 86, § 3, *pp.* 213–14.

So far as the federal legislation was concerned, the State was admittedly free to fix its own standards of need and its own level of benefits, and to determine the amount of funds which it would devote to the program. *King v. Smith, supra,* 392 *U. S.* at 318–319, 88 *S. Ct.* at 2133–2134, 20 *L. Ed.* 2d at 1126; *Rosado v. Wyman, supra,* 397 *U. S.* at 408, 90 *S. Ct.* at 1215, 25 *L. Ed.* 2d at 453; *Dandridge v. Williams, supra,* 397 *U. S.* at 478, 90 *S. Ct.* at 1158, 25 *L. Ed.* 2d at 498. And so far as the State's actual administration of the program was concerned, reference must of course be made to the comprehensive Categorical Assistance Budget Manual which embodies the pertinent administrative procedures, standards and regulations issued by the Commissioner for the governing agency, now known as the Division of Public Welfare, Department of Institutions and Agencies. *N. J. S. A.* 30:4B–1 *et seq. See Bailey v. Engelman,* 56 *N. J.* 54, 56 (1970).

When *L.* 1959, *c.* 86 was originally enacted it was geared largely towards dependent children in families in which there was but a single parent. However, in *L.* 1968, *c.* 138, the Legislature broadened the categories of eligibility to include families where there were two parents but the dependent child was deprived of parental support by reason of either (1) "the unemployment of his father" or (2) "the insufficient earnings of his parents." With respect to the "unemployment" category, as defined in federal legislation

(42 *U. S. C.* § 607), there was federal participation. However, with respect to the "insufficient earnings" category there was no federal participation and it was to be borne entirely by State funds. This latter category has come to to be known as the "N" segment and represents the sole New Jersey categorical program in which there is no federal funding.

*L.* 1968, *c.* 138 also contained a provision to meet the so-called "income disregard" requirement adopted in 1968 by Congress and designed as an incentive to welfare recipients to seek and retain employment. 42 *U. S. C.* § 602(a)(8). Under that requirement, approved State plans must provide that in computing need, representing the difference between the family's requirements and its resources, the State shall disregard the first $30 plus one-third of the remainder of the income earned. *L.* 1968, *c.* 138 repeated the language in *L.* 1959, *c.* 86 that, in determining need and the amount of assistance, all other income and resources of the dependent child and the parents or relatives with whom he is living, shall be taken into consideration, and then added the following: "except that, in making such determination, there shall be disregarded the amounts of income and resources required by Federal law as a condition of Federal financial participation." *L.* 1968, *c.* 138, § 2, *p.* 483; *N. J. S. A.* 44:10–3(c).

The need of a welfare family is computed by comparing its income with the standard set by the Division as representing the minimum amount which a family of its size would require to sustain itself. If the income received by the family is less than the need, then it is eligible for assistance, but in determining eligibility itself the income disregards are no factor. However, after eligibility is established, budgeting or the fixing of the amount of assistance to be paid occurs and involves a variety of factors including the income disregards. The budget deficit would represent the difference between the income, less the disregards and the other factors, and the amount of need; that difference

would ordinarily constitute the grant of assistance. However, Section 615 in the Budget Manual sets forth ceilings which vary with the number of members of the family unit and which are apparently fixed at a level one-third or more above average requirements. *Cf. Bailey v. Engelman, supra,* 56 *N. J.* at 56. The Section further sets forth formulae for calculating "total available adjusted income" and provides that when the applicable ceiling exceeds the available adjusted income the money grant shall be "the amount of such difference *or* the amount of the budget deficit, whichever is less. * * *" Budget Manual § 615.3.

In *Amos v. Engelman,* Civil Action No. 1340–69 *(D. N. J.* July 6, 1970), the plaintiffs attacked Section 615 on the ground, *inter alia,* that it did not give proper effect to the mandatory income disregards. A three-judge court sitting in the United States District Court for the District of New Jersey agreed with the plaintiffs and enjoined the enforcement of Section 615. The District Court dealt only in passing with *Dandridge v. Williams, supra,* 397 *U. S.* 471, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491, where family ceilings fixed by welfare regulations in Maryland without regard to the size of the family were attacked as violative of the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court rejected the attack in an opinion which noted that the Constitution did not empower the Court "to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." 397 *U. S.* at 487, 90 *S. Ct.* at 1163, 25 *L. Ed.* 2d at 503; *Bailey v. Engelman, supra,* 56 *N. J.* at 59.

The District Court's decision in *Amos v. Engelman, supra,* brought into sharp focus the financial dilemma confronting the Division of Public Welfare. New Jersey's public assistance programs have been among the most ambitious and the assistance levels in its AFDC program are perhaps the highest in the nation. But the costs have been burgeoning and have given rise to much public concern. The Governor

has, in his public addresses, stated that we are "deep in the throes of a welfare crisis" and has pointed out that three-fourths of all of the tremendous public welfare expenditures by New Jersey go into the AFDC program. A Welfare Study Commission appointed by the Governor has submitted various recommendations including one that the "N" segment, as presently structured and operated, be terminated and some legislation bearing on the recommendations may be expected. *Cf.* Assembly Bills A2296 and 2297 (1971).

All of the foregoing is appropriately noted in connection with the verified statement by the Director of Public Welfare that even prior to *Amos v. Engelman* there was an anticipated shortage in the Division's budget of $6.4 million dollars; that by continuance of the *Amos v. Engelman* injunction an additional shortage of at least $15 million and perhaps twice that much could be anticipated; that any assertion that the Legislature would appropriate the additional funds was an "optimism" which the Director did not share; and that, to the contrary, there was more likelihood that the Legislature would explicitly mandate limitations such as "maximum ceilings" regardless of family size and "ratable reductions" based on fixed percentages of actual budgeted needs. *See* Douglas, J., dissenting in *Dandridge v. Williams, supra,* 397 *U. S.* at 491–492, 90 *S. Ct.* at 1164–1165, 25 *L. Ed.* 2d at 506.

The Director, in his verified statement, refers to the consultations within the Division and the Executive Branch of the State Government following *Amos v. Engelman.* The goal was to meet the financial crisis with "the least harm to AFDC recipients" and the available alternatives were carefully considered. Maximum ceilings without regard to family size or need and ratable reductions were rejected in the belief that they would cause "severe hardship among the more than 250,000 children who are the beneficiaries of AFDC assistance." The Director points out that these children would have been peculiarly vulnerable as their families have no significant source of earned income "and they depend al-

most exclusively on AFDC assistance payments for their survival." After due deliberation it was concluded that "the imperatively required savings" could largely be effected by "reducing the cost of assistance to those welfare recipients in the 'N' segment of the Welfare Budget."

The primary considerations which led to the conclusion that the necessary savings could most fairly be achieved through modification of the benefits to the "N" segment were listed by the Director as follows: (a) rather than the entire group of more than two hundred fifty thousand children only some thirty thousand children would be affected; (b) there was an independent source of income, namely, that of the fully employed parent, from which the dependent child could be supported; (c) no federal contributions whatever would be lost or endangered; and (d) the "N" segment was one where "flagrant abuses were taking place." The Director set forth the following as illustrative of the abuses: "A parent, temporarily laid off, would become eligible for welfare, and then return to his or her position at the same salary, or in the case of a strike, perhaps a higher one. By virtue of their coming on the welfare rolls during the temporary period of unemployment, the income after reemployment would be subject to the income disregards of Section 615. The artificial reduction imposed by these disregards would result in lowered income level, on paper, which would render the family eligible for continued assistance under the 'N' segment although the same, or hitherto lower, income received prior to the period of unemployment was sufficiently high to disqualify the family from welfare assistance."

On September 18, 1970 the Commissioner promulgated Section 615A of the Categorical Assistance Budget Manual as an emergency regulation. This regulation, which applies solely to the "N" segment and sets forth the administrative ceiling in that segment's program of Assistance for Dependent Children, provides that when the applicable ceiling exceeds the available adjusted income, the money grant shall be the amount of such difference or the amount of the budget

deficit, whichever is less. There is a further explicit provision that in computing the budget deficit the income disregards shall not be applicable. A circular letter addressed to the County Welfare Directors contained a statement of the facts constituting the "imminent peril" requiring the emergency regulation. *See N. J. S. A.* 52:14B–4(c). The statement referred to the *Amos v. Engelman* injunction and to the need for reducing costs, and set forth that "the continued payment of a minimum adequate level of assistance, and therefore the health and welfare of more than 250,000 children in New Jersey, will be endangered if these regulations are not issued immediately." After Section 615A was promulgated as an emergency measure, notice was sent and there was publication in the New Jersey Register. 2 *N. J. R.* 84(a); *N. J. S. A.* 52:14B–4(a)(1). Comments were invited (2 *N. J. R.* 84(a)) and were duly considered, and on November 10, 1970 Section 615A was readopted in stated compliance with the Administrative Procedure Act. *N. J. S. A.* 52:14B–4.

In the meantime there were further judicial proceedings. The State pursued an appeal to the Supreme Court in *Amos v. Engelman* and on October 12, 1970 the Supreme Court granted the State's motion for a stay of the injunction pending further action in that Court, 400 *U. S.* 810, 91 *S. Ct.* 30, 27 *L. Ed.* 2d 39. However, between the date of the District Court's judgment (July 6, 1970) and the date of the Supreme Court's stay (October 12, 1970), the injunction was fully complied with, thus intensifying the existing shortage described earlier in this opinion. In response to a County Welfare Board's comment on the emergency nature of Section 615A as originally adopted, the Director of the Division of Public Welfare on October 27, 1970 stressed that, although the injunction had aggravated the financial situation, a deficit situation had existed prior to the injunction and the continuance of Section 615A as a permanent regulation would provide amelioration. In the same response, the Director noted that, although the adop-

tion of Section 615A was impelled by "strictly pragmatic considerations," it would not, in his opinion, bring about unnecessary imbalances or "cause any family break-up that would not otherwise occur."

On September 30, 1970 the plaintiffs filed their complaint in the New Jersey Superior Court, Chancery Division, seeking to have the regulation in Section 615A declared invalid and its application enjoined. The individual plaintiffs were aid recipients in the "N" segment and the organizational plaintiffs had members in that segment. The complaint did not attack the regulation on any constitutional ground nor did it assert that the regulation is incompatible with any federal statutory provision. It was grounded entirely on alleged violations of New Jersey statutory law. Thus in its first count it alleged that the Legislature intended to have the income disregards applied in the "N" segment and that consequently the regulation was ultra vires and beyond the statutory powers delegated to the Commissioner or the Division of Public Welfare. *N. J. S. A.* 44:10–3. In its second count it alleged that the regulation was promulgated without adequate compliance with the terms of the Administrative Procedure Act. *N. J. S. A.* 52:14B–1 *et seq.* And in its third count it alleged that there was no adequate compliance with the rules of the Division pertaining to the giving of notice to an aid recipient before any reduction in his aid takes effect. In this last connection it may be noted that the verified statement by the Director specifically pointed out that no reduction or termination would be made in any individual case without full and strict compliance with the Division's rules pertaining to such reduction or termination.

Upon the filing of the complaint, the Chancery Division issued an order to show cause but on October 13, 1970 it transferred the matter to the Appellate Division. *R.* 1:13–4; *R.* 2:5–1(e). Application by the plaintiffs for a stay of Section 615A was denied. The record prepared thereafter by the parties is rather sparse but no formal motions were

ever made for its supplementation as might readily have been done under the rules. *R.* 2:5–5(b). The briefs deal entirely with the two contentions being pressed by the plaintiffs, namely, that Section 615A, originally an emergency measure but subsequently readopted, was (1) ultra vires and (2) did not fulfill the requirements of the Administrative Procedure ·Act. In the light of the subject matters and terms of the pertinent statutes and the record before us we do not find these contentions particularly troublesome and now deal with them.

The plaintiffs have carefully detailed the history preceding the adoption of *L.* 1968, *c.* 138 and have referred to various rules of statutory construction. The history is significant to the extent that it sheds light on the legislative purposes but the rules of construction have only a subordinate bearing. As we said in *Jersey City Chap. Prop. Owner's, &c., Ass'n v. City Council,* 55 *N. J.* 86, 100 (1969), the statutory construction will not turn on "literalisms, technisms or the so-called formal rules of interpretation" but will turn "on the breadth of the objectives of the legislation and the commonsense of the situation." It is true, as the plaintiffs contend and the history discloses, that the Legislature contemplated and mandated that there would be a new category of ·eligibility based on the "insufficient earnings" of the dependent child's parents; as has been pointed out, this came to be known as the "N" segment and was given due recognition by the Commissioner and the Division. But we fail to find support for the plaintiffs' further contention that the Legislature contemplated and mandated that the income disregards would be an essential part of the "N" segment. Indeed the legislative approach was to restrict the imposition of specific mandates to those considered by it to be absolutely essential, and to entrust the administrative agency with comprehensive powers designed to enable it to operate equitably and reasonably under general standards and within the legislative appropriation.

In *N. J. S. A.* 44:10–1 *et seq.* the Legislature set forth general goals which the Division has conscientiously sought to achieve within the limits of available finances. The plaintiffs suggest that there was a legislative goal to deal with the "N" and other segments in uniform fashion but we do not find it. The Commissioner was authorized and directed to issue all necessary regulations and to do all things necessary to maximize federal participation. It appears clear to us that he was thus empowered to separate the segment which was wholly State supported from the segments which were, at least in part, federally supported. When dealing specifically with the income disregards the Legislature did not use language to suggest uniform treatment of the respective segments. Thus, after continuing the earlier language in *L.* 1959, *c.* 86 with respect to the taking into consideration of all other income in determining need for financial assistance, it added: "except that, in making such determination, there shall be disregarded the amounts of income and resources required by Federal law as a condition of Federal financial participation." This was intended to insure compliance with the federal statutory requirements applicable to those segments in which there is federal participation; it was not intended to tie the hands of the agency in its administration of the "N" segment in which there is no federal participation and consequently there are no federal statutory requirements. The fact that the Division for a time did apply the income disregards to the "N" segment has no bearing other than perhaps to indicate that, in the absence of the compelling financial limitations, the Division would presumably have continued to apply the income disregards to all segments.

The plaintiffs suggest that the construction we have reached leaves the legislation without the necessary standards for a constitutional delegation of authority to the agency. While we have continued the form of the traditional requirement that delegation must have a sufficient accompanying standard, we have consistently sustained general standards

and have not hesitated to imply them. *See Ward v. Scott,*
11 *N. J.* 117, 122–128 (1952) ; *Schierstead v. City of Brigantine,* 20 *N. J.* 164, 169 (1955) ; *In re Berardi,* 23 *N. J.*
485, 491 (1957) ; *Wes Outdoor Advertising Co. v. Goldberg,*
55 *N. J.* 347, 350–353 (1970) ; *State v. Owens-Corning Fiberglas Corp.,* 100 *N. J. Super.* 366, 382–384 (*App. Div.* 1968),
*aff'd,* 53 *N. J.* 248 (1969) ; *Ass'n of N. J. State Col. Fac.
v. Bd. of Higher Ed.,* 112 *N. J. Super.* 237, 257–259 (*Law
Div.* 1970). Indeed in recent days we have attached greater
significance to the presence of procedural and judicial safeguards against unreasonable and unwarranted agency action
than we have to the presence of details in the statutory standards. *See Burton, et al. v. Sills,* 53 *N. J.* 86, 91 (1968),
*appeal dismissed,* 394 *U. S.* 812, 89 *S. Ct.* 1486, 22 *L. Ed.*
2d 748 (1969) ; *State v. Owens-Corning Fiberglas Corp.,
supra,* 100 *N. J. Super.* at 385; *Esso Standard Oil Co. v.
Holderman,* 75 *N. J. Super.* 455, 474 (*App. Div.* 1962),
*aff'd,* 39 *N. J.* 355, *appeal dismissed,* 375 *U. S.* 43, 84 *S.
Ct.* 148, 11 *L. Ed.* 2d 107 (1963).

 In the light of the foregoing there can be no serious
question as to the sufficiency of the standards in *N. J. S. A.*
44:10–1 *et seq.* The statute directs that needy and dependent
children, as therein defined, shall be entitled to public welfare assistance. *N. J. S. A.* 44:10–1, 2. It further directs,
*inter alia,* that welfare programs be in effect in all counties;
that assistance be furnished with reasonable promptitude;
that all resources and income be considered in determining
need except that, as discussed earlier in this opinion, there
shall be disregarded the amounts required by federal law as
a condition of federal participation; that appropriate services
be made available for strengthening family life for children; and that appropriate services and cooperative arrangements be provided with other agencies so that maximum opportunities for training and employment be available to welfare recipients. *N. J. S. A.* 44:10–3. It authorizes and directs the Commissioner to do all things necessary for maximizing federal funding, and it authorizes and directs

him to promulgate all necessary rules, regulations and administrative orders. These promulgations, which are expressly made subject to the policies established by the State Board of Control (*N. J. S. A.* 44:10–3), must of course be reasonable and in overall furtherance of the broad welfare assistance goals of the Legislature. *Cf. Davis, Administrative Law* § 2.04, *p.* 64 (1970 *Supp.*). Procedurally they have the adequate accompanying safeguards of, not only the agency's rules, but also the Administrative Procedure Act. *N. J. S. A.* 52:14B–4, 5. And, judicially, they are subject to adequate review with suitable relief from illegal or arbitrary action. *See Burton, et al. v. Sills, supra,* 53 *N. J.* at 91; *Ward v. Scott, supra,* 11 *N. J.* at 126–128.

■■ We are entirely satisfied that Section 615A was not ultra vires (*cf. Cole Nat. Corp. v. State Bd. of Examiners,* 57 *N. J.* 227, 231 (1970)) and now come to the plaintiffs' remaining contention that the manner of its adoption did not fulfill the terms of the Administrative Procedure Act. They assert that, in the first place, 615A was not properly adopted as an emergency measure. Though this question may be moot, we consider that there was substantial compliance with *N. J. S. A.* 52:14B–4(c) which provides that, if an agency finds with stated reasons that "an imminent peril" to the public health, safety or welfare so requires, it may adopt a rule without prior notice or hearing. After the restraint in *Amos v. Engelman, supra,* had been in effect for about two months and the Division had fair opportunity to assess its impact it concluded that the aggravated financial situation was such that 615A should be immediately adopted as an emergency measure in order to avoid jeopardizing the entire AFDC program. It could properly view the matter, as it did, as an imminent peril to the public health, safety or welfare within the meaning of *N. J. S. A.* 52:14B–4(c) and in its circular letter, which was widely distributed, it adequately set forth the reasons for the emergency action and the terms of the regulation. *See* 2 *N. J. R.* 84(a); *see*

also *Rules of Administrative Procedure*, 1 *N. J. R.* 5 §§ 15:5–4.20, 21, 22.

■ In accordance with *N. J. S. A.* 52:14B–4(a) the Division gave the required notice in advance of its later readoption of Section 615A. The notice was mailed to all persons who had made "timely request of the agency for advance notice of its rule-making proceedings." (*N. J. S. A.* 52:14B–4(a)(1)) and was published in the New Jersey Register. 2 *N. J. R.* 84(a). It stated that all interested persons could present statements or arguments in writing to the agency and that, after considering all written comments with respect to the emergency rule, the agency would determine whether to readopt it. *N. J. S. A.* 52:14B–4(a)(2); 2 *N. J. R.* 84(a). Many comments were received including those submitted by counsel for the plaintiffs. After due consideration the Division on November 10, 1970, readopted Section 615A. Though the plaintiffs urge that *N. J. S. A.* 52:14B–4 was not fairly honored we find that there was substantial compliance with its purposes and terms.

The plaintiffs apparently entertain the view that prior to the promulgation of Section 615A there should have been a formal public hearing, on individual notice to the many thousands affected, and at which evidence could have been presented with the right of direct and cross interrogation. The impracticalities of such a course would appear to be quite manifest and there was no legal compulsion that it be followed. The statute which authorized the Commissioner to promulgate the welfare regulations deliberately omitted any requirement for public hearing prior to his taking of such action which was admittedly quasi-legislative in nature. *See N. J. S. A.* 44:10–1 *et seq.; Consolidation Coal Co., et al. v. Kandle, et al.*, 105 *N. J. Super.* 104, 112–120 (*App. Div.*), *aff'd*, 54 *N. J.* 11 (1969); *cf. Abbotts Dairies, Inc. v. Armstrong*, 14 *N. J.* 319, 332 (1954); *The Pennsylvania Railroad Co. v. Dept. of Public Utilities*, 14 *N. J.* 411, 426 (1954). And while the Administrative Procedure Act provided for timely opportunity to submit data and

arguments (*N. J. S. A.* 52:14B-4(a)(2)) it deliberately omitted any requirement for a formal public evidentiary hearing as part of the rule-making process. *Cf. California Citizens Band Association v. United States,* 375 *F.* 2d 43, 50 (9 *Cir.*), *cert. denied,* 389 *U. S.* 844, 88 *S. Ct.* 96, 19 *L. Ed.* 2d 112 (1967); *Siegel v. Atomic Energy Commission,* 130 *U. S. App. D. C.* 307, 400 *F.* 2d 778, 785-786 (*D. C. Cir.* 1968).

██ Finally we note that, although the Commissioner has not made reference to it, his action is entitled to the benefit of the customary rebuttable presumption of validity and regularity afforded to administrative regulations generally. *See Cole Nat. Corp. v. State Bd. of Examiners, supra,* 57 *N. J.* at 231; *In re Weston,* 36 *N. J.* 258, 263-264 (1961), *cert. denied,* 369 *U. S.* 864, 82 *S. Ct.* 1029, 8 *L. Ed.* 2d 84 (1962); *Hall v. Bd. of Pub. Utility Commissioners,* 112 *N. J. Super.* 206, 210 (*App. Div.* 1970); *Consolidation Coal Co., et al. v. Kandle, et al., supra,* 105 *N. J. Super.* at 118-119. In view of the various matters set forth earlier in this opinion the plaintiffs' attack on Section 615A must be rejected; accordingly, the Commissioner's action in adopting it is now:

Affirmed.

*For affirmance*—Chief Jusitce WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.