127 N.J. Super. 160 (1974)
316 A.2d 711
HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION AND STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFFS,
v.
MUNICIPAL SANITARY LANDFILL AUTHORITY, A JOINT VENTURE OF WILLIAM A. KEEGAN, INC., RECLAMATION AND IMPROVEMENT CO., PETER ROSELLE & SONS, INC., AND DELAWARE SANITARY CO., DEFENDANTS, AND CITY OF YONKERS, NEW YORK, DEFENDANT-INTERVENOR.
Superior Court of New Jersey, Chancery Division.
Decided February 13, 1974.
*162 Mr. Mark L. First, Deputy Attorney General, for plaintiffs (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
Mr. David Samson for defendants (Messrs. Lieb, Wolff & Samson, attorneys).
Mr. Eugene J. Fox, of the New York Bar, Corp. Counsel for City of Yonkers, pro hac vice for defendant-intervenor (Messrs. Schapira, Steiner & Walder, attorneys).
SCHREIBER, J.S.C.
The Hackensack Meadowlands Development Commission (HMDC) and the State of New Jersey, Department of Environmental Protection (DEP), seek to enjoin the Municipal Sanitary Landfill Authority (MSLA) from accepting for disposal in its landfill site located within *163 the Hackensack Meadowlands District any solid wastes originating from or collected outside the territorial limits of New Jersey. Both HMDC and DEP had adopted regulations, effective September 1, 1973 and August 31, 1973, respectively, which prohibited such disposal.
An ad interim restraint, consented to by defendant, had been entered pending determination of the request for a permanent injunction. On the return date of the order to show cause defendants answered by challenging the constitutionality of the regulations and the Waste Control Act, N.J.S.A. 13:11-1 et seq. The hearing was adjourned to allow plaintiffs time to respond to the challenges. In the meantime the City of Yonkers, New York, whose refuse was being deposited on the MSLA site, moved for and was granted leave to intervene as a party defendant. No testimony was taken at the hearing. The parties relied on affidavits and the transcript of proceedings taken before the Hackensack Meadowlands Commission on June 18, 1973.
MSLA has made a three-fold attack. It contends that (1) the Waste Control Act, regulation N.J.A.C. 7:26-1.5 promulgated thereunder, and certain regulations of HMDC, namely, N.J.A.C. 19:7-1.1(g) and (h), are invalid, arbitrary and unreasonable; (2) the procedure followed by DEP in promulgating its rule, N.J.A.C. 7:26-1.5, violated due process of law, and (3) all the above designated regulations and the Waste Control Act must fall because they violate Article 1, Section 8, paragraph 3 (the Commerce Clause) and Article 4, Section 2, (the Privileges and Immunities Clause) of the U.S. Constitution.

I
The Waste Control Act, N.J.S.A. 13:1I-1 to 8, recites that the Legislature found that the disposal of wastes generated or collected outside the State poses a threat to the quality of New Jersey's environment and that the Commissioner of Environmental Protection was empowered to create *164 regulations prohibiting the "landfill of solid waste" and the "disposal of liquid wastes" within the State which originated or were collected outside New Jersey. The Commissioner adopted Regulation N.J.A.C. 7:26-1.5, effective August 31, 1973, which reads as follows:

Out of State waste
(a) No person engaged in the collection of solid or liquid wastes shall dispose of any solid or liquid wastes which originated or were collected outside the territorial limits of this State in sanitary landfills in the Hackensack Meadowlands District.
(b) No person owning or operating a sanitary landfill within the Hackensack Meadowlands District shall accept for disposal in such sanitary landfill any solid or liquid wastes which originated or were collected outside the territorial limits of this State.
Defendant contends that there is no basis for the Legislature's findings, that the regulation is invalid in the absence of a showing of a causal relationship between banning out-of-state garbage in New Jersey and a threat to its environment, and that the regulation is overly broad by banning all wastes. The statute and the administrative regulations are presumptively valid. Harvey v. Essex County Board of Freeholders, 30 N.J. 381 (1959); Burton v. Sills, 53 N.J. 86 (1968); State v. Profaci, 56 N.J. 346 (1970). Since one can reasonably and readily conceive of facts which would support the Legislature's findings and the Commissioner's regulations, the onus is on defendant to establish that the Legislature's and Commissioner's actions are arbitrary. Consolidation Coal Co. v. Kandle, 105 N.J. Super. 104 (App. Div. 1969), aff'd 54 N.J. 11 (1969); Municipal Sanitary Landfill Authority v. Hackensack Meadowlands Development Comm'n, 120 N.J. Super. 118 (App. Div. 1972); Borden's Farm Products Co., Inc. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934). Defendant's proof consisted of an affidavit of an engineer, Dennis L. Backus, and the transcript of proceedings before the Hackensack Meadowlands Commission held on June 18, 1973 with respect to its proposed regulations. The affidavit asserts that quantities of solid *165 wastes are used for construction purposes and that therefore a complete ban on disposal of out-of-state solid wastes is inappropriate. This conclusion does not necessarily follow because no reference is made to the amount of New Jersey refuse which is being used for landfill purposes, the limited amount of area available, and the environmental and public health impacts involved. Further, an affidavit of Lino Pereira, the Principal Environmental Engineer of DEP, asserts that sanitary landfills "present a pollution danger because they do not conserve or recover resources but bury them, and because they severely limit the future use of the land on which they are located." Additionally, he avers that sanitary landfills present a unique fire problem. An affidavit of Bernhard V. Lind, Acting Chief of the Bureau of Solid Waste Management in the DEP, asserts that of the 55,000 tons per week of solid waste being disposed of in the Hackensack Meadowlands District, 10,000 tons originated outside New Jersey and there was an acute shortage of remaining landfill life located there. In view of all the foregoing, it is obvious that MSLA has not met its burden.
The same type of attack has been made upon regulations N.J.A.C. 19:7-1.1(g) and (h) of the HMDC. These regulations read as follows:
19:7-1.1(g). No solid waste originating or collected outside of the territorial jurisdiction of New Jersey shall be disposed of or treated within the Hackensack Meadowlands District. No sanitary landfill operator shall accept for disposal, at a sanitary landfill within the Hackensack Meadowlands District, any solid waste originating or collected outside of the territorial limits of New Jersey.
19:7-1.1(h). All operators of sanitary landfills within the Hackensack Meadowlands District shall submit to the Commission, together with their applications, as provided in Sections 3 and 4 of this subchapter, a certification stating that no solid waste originating or collected outside of the territorial limits of New Jersey will be accepted for disposal or treatment.
Defendant has made no showing that there was no basis for these regulations. The affidavits of William D. McDowell, Executive Director of HMDC, and George D. Cascino, its *166 Chief Engineer, disclosed that three surveys had been made to determine the volume and origin of solid waste disposed of in landfills in the Hackensack Meadowlands District. The first disclosed that in 1968 some 30,000 tons were entering the District each week, of which 4,000 tons originated outside New Jersey. HMDC study in 1971 revealed that the weekly tonnage was 42,000, of which 5,000 emanated from outside the State. In April 1973 HMDC updated its study. At that time weekly tonnage had increased to 55,000, of which 10,000 came from sources outside New Jersey. The Commission concluded that the sites had only three years of life remaining and that banning of out-of-state garbage would extend the landfill life some six months.
Under the Hackensack Meadowlands Development Act the Commission must provide disposal facilities for the New Jersey municipalities (totalling 118, according to plaintiffs) which had been utilizing the District. N.J.S.A. 13:17-10(a), (b) and (e). The affidavits point out that the Commission needs as much time as possible to develop a viable alternate method of disposal. One cannot reasonably contend that promulgation of the regulations under the totality of these facts and circumstances was arbitrary.
Defendant also argues that the HMDC regulations contravene N.J.S.A. 13:17-6(w) and 13:17-10(b) and (e) by failing to provide for disposal facilities for waste equal to levels at the time the statute was passed, which levels included out-of-state waste. N.J.S.A. 13:17-6(w) authorizes HMDC "to provide solid waste disposal facilities for the treatment and disposal of solid waste, as hereinafter provided." N.J.S.A. 13:17-10 reads:
(a) Within 6 months of the effective date of this act the commission shall undertake and complete a survey of the district to determine the total amount of solid waste treated and disposed on a daily basis in the district as of the effective date of this act by persons in this State.
(b) The commission is hereby authorized, empowered and directed to guarantee that solid waste disposal facilities sufficient to treat and *167 dispose of the total amount of solid waste determined by its survey shall be available or be provided by the commission.

* * * * * * * *
(e) The commission, in its discretion, may provide solid waste disposal facilities sufficient to treat and dispose of more than the total amount of solid waste determined by its survey, and may make such facilities available to persons other than those treating and disposing of solid waste in the district as of the effective date of this act. [Emphasis added]
Defendant reads these three sections together as guaranteeing continued use to all persons utilizing the disposal facilities in the Meadowlands at the time the act was passed. To interpret the statute in that way, however, one must delete the last three words in subsection (a). The inclusion of those words, "in this State," demonstrates that the Legislature was concerned about waste collected in New Jersey. If it intended to include all waste disposed of in the Meadowlands no matter where its origin, the phrase "in this State" would not have been inserted, since, obviously, garbage dumped in the Meadowlands is dumped in this State. One must assume in interpreting a statute that the legislators would not insert a redundant or meaningless phrase. The only significance in these words is that the Legislature was interested in providing for disposal of New Jersey garbage  therefore, the remaining subsections, when referring to the "total amount of solid waste determined by its [the Commission's] survey," are concerned with the total amount of garbage disposed of in the Meadowlands by persons in this State, i.e., the total amount of New Jersey waste dumped in the Meadowlands. This is the only sensible interpretation. The concern of the New Jersey Legislature was to safeguard the area for New Jersey operations  not New York, Pennsylvania, or other jurisdictions. As Justice Jacobs wrote in J.C. Chap. Prop. Owners', etc., Ass'n v. City Council, 55 N.J. 86 (1969):
When all is said and done, the matter of statutory construction here will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation. [at 100]
*168 To the same effect: State v. New Jersey National Bank and Trust Co., 62 N.J. 50 (1972). Defendant's contention that the regulations contravene the enabling statute is unsound for the statute mandates only that the Commission guarantee disposal facilities for New Jersey communities utilizing the landfill sites as of the effective date of the act.

II
Defendant attacks the procedure followed by the DEP in adopting N.J.A.C. 7:26-1.5, claiming that the failure to hold a hearing prior to adoption of the rule denied defendants due process. This contention has no merit. Plaintiff DEP caused the proposed regulation to be published in the New Jersey Register on July 5, 1973, with the statement that "interested persons may present statements or arguments in writing relevant to the proposed action on or before August 3, 1973." 5 N.J.R. 220(c). This notice was consistent with the Administrative Procedure Act, N.J.S.A. 52:14B-1, et seq., and complied with N.J.S.A. 52:14B-4(a) (2), affording any interested person a reasonable opportunity to be heard. Defendant concedes that the act does not require a formal hearing and that it did not submit a statement or request a hearing. The uncontroverted statement in the affidavit of Mr. Lind is that no written statement or argument was received by DEP from any interested person. Under these circumstances there was no constitutional or statutory requirement that a hearing be held prior to the promulgation of the regulations. Motyka v. McCorkle, 58 N.J. 165 (1971).

III
There remains defendant's constitutional challenges. i.e., that the DEP and HMDC regulations set forth above violate Article I, Section 8, paragraph 3 (Commerce Clause) and Article IV, Section 2 (Privileges and Immunities Clause) of the U.S. Constitution. (Defendant has not *169 argued the Waste Control Act is unconstitutional). Defendant has not vigorously advanced its argument with respect to Article IV, Section 2, and it is not necessary to deal with that contention in depth. Suffice it to say there are serious infirmities in that position, such as the fact that it is not applicable to corporations and that it only applies where there is no substantial reason for the discrimination. Paul v. Virginia, 8 Wall. 168, 75 U.S. 168, 19 L.Ed. 357 (1868); Hemphill v. Orloff, 277 U.S. 537, 48 S.Ct. 577, 72 L.Ed. 978 (1928); Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).
Article I, Section 8, provides that "Congress shall have power * * * to regulate commerce * * * among the several States * * *." DEP and HMDC contend that garbage is not a legitimate subject of trade or commerce and therefore not within the purview of the Commerce Clause. They rely upon a number of cases which recognize the power of a state to forbid the sale or importation of impure foods or such articles as would spread disease and pestilence and would be immediate causes of destruction of or injury to human health and life. A state's prohibition of the interstate transportation of diseased animals has been held not to contravene the Commerce Clause. Clason v. Indiana, 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939). Similarly, statutes forbidding the importation and sale of adulterated or injurious food or drugs have withstood constitutional attacks. Crossman v. Lurman, 192 U.S. 189, 24 S.Ct. 234, 48 L.Ed. 401 (1904); Price v. Illinois, 238 U.S. 446, 35 S.Ct. 892, 59 L.Ed. 1400 (1915). In Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915), a Florida statute prohibiting the exportation of fruits which were unfit for human consumption was held valid. All these cases classified the matter (diseased animals, adulterated food, fruit unfit for human consumption) as nonmerchantable. In all the food and drug cases the articles were banned to protect the public from mistaking them for pure and wholesome foods and to prevent the spread of disease. The articles involved *170 had no useful purpose and were per se dangerous to health. On the other hand, refuse may be utilized for construction, landfill, recycling of paper, bottles and metal, and production of electricity. In passing, it might be noted that some successful incinerator systems which create waste heat for power generation exist in Germany, the Netherlands, France and Switzerland. In the instant situation there is no prohibition against the transportation of out-of-state garbage in or through New Jersey or the disposal of such refuse in New Jersey landfill sites located in places other than the Hackensack Meadowlands District.[1] It is not the danger to public health due to transportation of garbage in New Jersey or location of the garbage in a licensed landfill site in the State which is the evil that the Waste Control Act and the regulations are directed at. The purpose is conservation of the land used for disposal sites in the Hackensack Meadowlands District so that their life expectancy will be extended from 3 to 3 1/2 years. In any event, the regulations in question here which are directed to the restricted use of sites for New Jersey garbage cannot be sanctioned on the concept that garbage is not a legitimate subject of interstate commerce.
*171 It is well established that a state may, in the exercise of its police power, enact legislation, even though it may affect interstate commerce, provided that the Federal Government has not preempted the field. Gibbons v. Ogden, 9 Wheat 1, 22 U.S. 1, 6 L.Ed. 23 (1824); Missouri, Kansas & Texas Railway v. Haber, 169 U.S. 613, 18 S.Ct. 488, 42 L.Ed. 878 (1898); Sligh v. Kirkwood, supra.; Yellow Cab Co. of Camden v. State, 126 N.J. Super. 81 (App. Div. 1973), certif. den. 64 N.J. 498 (1974).
The Federal Government has not adopted legislation dealing with the use of waste landfill sites. Further, the regulations and statute in question are clearly within the authority of the State's police power to conserve its landfill sites. It has been recognized that the dumping of garbage in a landfill is an unattractive and undesirable use of land and that it creates potential health and fire hazards. In Shaw v. Byram Tp., 86 N.J. Super. 598 (App. Div. 1965), Judge (now Justice) Sullivan wrote:
* * * Garbage or refuse is unsightly, smelly, attracts flies and rodents, and is a potential fire hazard. It is a prime source of disease and contamination. It has been called a necessary evil because it is a by-product of civilized society. Ordinarily, some provision is made for its collection and disposal by the local government. However, problems of public health and welfare are involved, and no matter how carefully regulated, garbage dumps present some hazard to a community, the degree of hazard being directly related to the amount of garbage dumped. [at 602]
In Municipal Sanitary Landfill Authority v. Hackensack Meadowlands Development Comm'n, Judge Lynch approved the Commission's finding that:
Sanitary landfills conducted on virgin land forever ruin the possibility of preserving the site for conservation. Additionally, such landfill operations can have an adverse effect on the ecological balance of the surrounding area. A sanitary landfill operation also has severe limiting effects on future development of the property. Problems of settlement, gas generation, and fires make it difficult to construct structures on former landfill sites. [120 N.J. Super. at 122]
*172 However, state regulations and laws based on the exercise of the police power may only stand if they do not discriminate against interstate commerce. In other words, the exercise of the police power may not be predicated on a method directed against interstate commerce. Plaintiffs concede that this is so. This nondiscrimination principle has been expounded in several United States Supreme Court decisions. In Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), the City of Detroit had passed an ordinance which limited the permissible amount and density of smoke emissions from the boiler stacks of vessels while docked in the city. Huron Portland Cement Co., a Michigan corporation whose ships travelled among several states via the Great Lakes, challenged the code as an unlawful interference with interstate commerce. The court held that the ordinance was a valid exercise of the state's police power since it applied generally to all ships and did not discriminate in favor of local industry. Mr. Justice Stewart wrote:
* * * State regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand. Hennington v. Georgia, 163 U.S. 299, 16 S.Ct. 1086, 41 L.Ed. 166; Lake Shore & M.S.R. Co. v. Ohio, 173 U.S. 285, 19 S.Ct. 465, 43 L.Ed. 702; Pennsylvania Gas Co. v. Public Service Com. 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 [PUR 1920E 18]; Milk Control Bd. v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752; Bob-Lo Excursion Co. v. Michigan, 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455.

* * * * * * * *
It has not been suggested that the local ordinance, applicable alike to "any person, firm or corporation" within the city, discriminates against interstate commerce as such. It is a regulation of general application designed to better the health and welfare of the community. * * * We conclude that no impermissible burden on commerce has been shown. [at 448, 80 S.Ct. at 818].
In S.C. Hwy. Dept. v. Barnwell Bros. Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 1522 (1938), Mr. Justice Stone, in upholding a state law which limited the width and load of trucks on state highways, wrote:
*173 The commerce clause by its own force, prohibits discrimination against interstate commerce, whatever its form or method, and the decisions of this Court have recognized that there is scope for its like operation when state legislation nominally of local concern is in point of fact aimed at interstate commerce, or by its necessary operation is a means of gaining a local benefit by throwing the attendant burdens on those without the state. Robbins v. Shelby County Taxing District, 120 U.S. 489, 498, 30 L.Ed. 1189; Caldwell v. North Carolina, 187 U.S. 622, 626, 47 L.Ed. 336. It was to end these practices that the commerce clause was adopted.
In Guy v. Baltimore, 100 U.S. 434, 25 L.Ed. 743 (1879), a Maryland statute authorized Baltimore to collect wharfage fees from all vessels which docked in city wharves, provided that the material to be loaded or unloaded was not produced in Maryland. The city adopted an ordinance accordingly. The court commented:
In the exercise of its police powers, a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the health or which would endanger the ilves or property of its people. But if the State, under the guise of exerting its police powers, should make such exclusion or prohibition applicable solely to articles, of that kind, that may be produced or manufactured in other States, the courts would find no difficulty in holding such legislation to be in conflict with the Constitution of the United States. [at 443]
The court invalidated the ordinance on the ground that:
* * * no State can, consistently with the Federal Constitution, impose upon the products of other States, brought therein for sale or use, or upon citizens because engaged in the sale therein, or the transportation thereto, of the products of other States more onerous public burdens or taxes than it imposes upon the like products of its own territory. [at 439]
The court also indicated that the wharves were property held for public use by the municipality, which could not "be permitted by discrimination" to impede commercial intercourse. That property held for public use may not be limited on a discriminatory basis has peculiar pertinence here. The New Jersey Legislature has deemed it appropriate to classify operations *174 of garbage landfill sites as public utilities. N.J.S.A. 48:2-13. As such they would appear to be affected with a public interest as much as a municipally owned wharf. It might be noted that the State has expressly prohibited a public utility from directly or indirectly making or giving "any undue or unreasonable preference or advantage to any person, locality or particular description of traffic, or subject any particular person, locality or particular description of traffic to any prejudice or disadvantage." N.J.S.A. 48: 3-4.
DEP and HMDC rationalize that discrimination is absent because the regulations do not prefer New Jersey over out-of-state landfill operators or garbage haulers. The difficulty with that rationale is that it is the discrimination based on the origin of the refuse, not the residence of the owner or carrier, which is invidious. Transportation of the refuse, whether carried by New Jerseyans or nonresidents, in interstate commerce is directly affected by the ban.
Although the State's objective in attempting to conserve a local natural resource for local needs is a proper police power purpose, that cannot be accomplished by discrimination based on the source of the refuse. In Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), a West Virginia statute restricted the exportation of natural gas to ensure a sufficient supply for its own citizens. Although the Supreme Court recognized (at 598, 43 S.Ct. at 665) that "the gas is a natural product of the state and has become a necessity therein, that the supply is waning and no longer sufficient to satisfy local needs and be used abroad, and that the act is therefore a legitimate measure of conservation in the interest of people of the state," the statute had to fall because it interfered with interstate commerce.
Oklahoma enacted a law which prevented a pipeline company from transporting natural gas outside the state. The purpose of the law was to conserve natural gas in the Oklahoma fields for consumption in the state. In declaring the statute violative of the Commerce Clause, the U.S. Supreme *175 Court, in West v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), commented:
* * * The statute of Oklahoma recognizes it to be a subject of intrastate commerce, but seeks to prohibit it from being the subject of interstate commerce, and this is the purpose of its conservation. In other words, the purpose of its conservation is in a sense commercial  the business welfare of the State, as coal might be, or timber. Both of those products may be limited in amount, and the same consideration of the public welfare which would confine gas to the use of the inhabitants of a State would confine them to the inhabitants of the State. If the States have such power a singular situation might result. Pennsylvania might keep its coal, the Northwest its timber, the mining States their minerals. And why may not the products of the field be brought within the principle? Thus enlarged, or without that enlargement, its influence on interstate commerce need not be pointed out. To what consequence does such power tend? If one State has it, all States have it; embargo may be retaliated by embargo, and commerce will be halted at state lines. And yet we have said that "in matters of foreign and interstate commerce there are no state lines." In such commerce, instead of the States, a new power appears and a new welfare,  a welfare which transcends that of any State. But rather let us say it is constituted of the welfare of all of the States and that of each State is made the greater by a division of its resources, natural and created, with every other State, and those of every other State with it. This was the purpose, as it is the result, of the interstate commerce clause of the Constitution of the United States. If there is to be a turning backward it must be done by the authority of another instrumentality than a court. [at 255, 31 S.Ct. at 571]
The Commissioner of Environmental Protection and the Hackensack Meadowlands Development Commission adopted the regulations in question to expand the life of the landfill sites for garbage collection in the Hackensack Meadowlands District from 3 to 3 1/2 years. To attempt to accomplish that end by discriminating against sources of refuse solely because they originate or are collected outside the State under the circumstances here contravenes Article I, Section 8, Clause 3 of the U.S. Constitution. The regulations are invalid.
NOTES
[1] L. 1973, c. 363, enacted on January 2, 1974, authorizes the Commissioner of the Department of Environmental Protection to determine when any solid or liquid waste which originated or was collected outside New Jersey may not be brought into the State. He has enacted regulations to that effect. N.J.A.C. 7:1-4.2. The effect of that statute and regulations is not before the court, although they may render this decision moot. It is interesting to note that the regulations adopted by the Commissioner except from the prohibition separated waste material intended for recycling or reclamation, municipal solid waste to be processed into reusable secondary materials, including fuel and heat, and "hazardous waste" which is to be treated in a solid waste disposal facility. The new law and regulations are concerned with the public health as well as environmental impact. The Commissioner's definition of "hazardous waste" would appear to fall into category of nonmerchantable material not subject to the Commerce Clause. N.J.A.C. 7:1-4.1.