**ALEXANDRIA SCRAP CORPORATION**

v.

**Harry R. HUGHES, Secretary, Maryland Department of Transportation, et al.**

**Civ. No. K–74–1030.**

United States District Court,
D. Maryland.

March 12, 1975.

Norman P. Ramsey, H. Thomas Howell and Carl E. Eastwick, Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen., of Md., J. Michael McWilliams, Asst. Atty. Gen., and Counsel to Dept. of Transportation, Judson P. Garrett, Jr., Asst. Atty. Gen., and N. Barton Benson, Sp. Asst. Atty. Gen., Baltimore, Md., for defendants.

Before WINTER, Circuit Judge, and KAUFMAN and MILLER, District Judges.

FRANK R. KAUFMAN, District Judge.

Plaintiff, a Virginia corporation, with its principal place of business located in that State, is engaged in the business of processing iron, steel, and nonferrous scrap metal into scrap for sale for resmelting. Plaintiff challenges certain Maryland statutory provisions, namely, 6 Md.Ann.Code art. 66½, § 11–

1002.2(f)(5) (1974 Cum.Supp.)[1] as repugnant to the Commerce Clause of the federal Constitution and as contravening, both facially and as applied, the Equal Protection Clause of the Fourteenth Amendment. Defendants are officials of the State of Maryland charged with the administration of the challenged statute. Jurisdiction in this case exists pursuant to 28 U.S.C. §§ 1331 and 1343.[2]

Plaintiff seeks injunctive relief[3] pursuant to the provisions of 28 U.S.C. §§ 2281 and 2284[4] and declaratory relief pursuant to the provisions of 28 U.S.C. §§ 2201 and 2202. Specifically, plaintiff asks this Court to declare unconstitutional the provisions of section 11–1002.-2(f)(5) and accordingly either to (1) require defendants to give certain "indemnity agreements" entered into by plaintiff the same effect as is given such agreements when entered into by licensed scrap processors whose plants are located within the State of Maryland and to enjoin defendants from withholding certain bounty payments which would be payable to plaintiff if its plant were so located, or, alternatively, (2) deny to licensed scrap processors with plants located and operating within the State of Maryland the authority to execute and file such indemnity agreements and also deny to them payment of bounties pursuant to such agreements.

Both sides seek summary judgment upon the basis of factual stipulations filed herein. While this Court notes that the factual positions of the parties differ in some respects, the uncontroverted facts entitle plaintiff, in the opinion of this Court, to the grant of summary judgment.

## I. THE FACTS

### A. *The Legislative Scheme*

By 1969, as the Court of Appeals of Maryland stated in Administrator, Motor Vehicle Administration v. Vogt, 267 Md. 660, 670, 299 A.2d 1, 6 (1973), in which it upheld the 1969 legislation in the face of an equal protection attack,

> * * * problems developing from the storage of old automobiles * * * had become a cause for concern in terms of environmental health [in Maryland]. There was evidence, for example, that some hulks [had] * * * remained undisturbed so

1. Hereinafter, all references to 6 Md.Ann. Code art. 66½ (1974 Cum.Supp.) are cited only by section number.

2. Jurisdiction may also exist under 28 U.S.C. § 1332. However, defendants contend that plaintiff, a Virginia corporation, has not registered to do business in Maryland pursuant to 2B Md.Ann.Code art. 23, § 90 (1973 Repl.Vol.) and that that failure so to register precludes plaintiff from suing in a Maryland state court under 2B Md.Ann.Code art. 23, § 91(c) (1973 Repl.Vol.) and thus in this federal court in a case bottomed upon diversity jurisdiction. Woods v. Interstate Realty Co., 337 U.S. 535, 538, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949). Whether plaintiff is doing business within Maryland, see G. E. M., Inc. v. Plough, Inc., 228 Md. 484, 488, 180 A.2d 478 (1962) and/or whether, pursuant to Allenberg Cotton Co. v. Pittman, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195, 206 (1974), plaintiff is a foreign corporation engaged only in interstate commerce within Maryland and is thus entitled to access to Maryland's courts and to this Court in a di-

versity case, pose issues which need not be resolved herein since jurisdiction other than diversity jurisdiction is present.

3. Plaintiff's initial request for preliminary injunctive relief has not been pressed in light of efforts made by all concerned to ensure a speedy adjudication of the within controversy.

4. Defendants, contending that there does not exist any sufficiently "substantial" federal question warranting the convening of a three-judge court, oppose the same. Goosby v. Osser, 409 U.S. 512, 518–19, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973) ; Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933) ; Citizens for a Representative General Assembly v. Governor of Maryland, 429 F.2d 606, 611 (4th Cir. 1970). The view which this Court takes of the Commerce Clause and equal protection questions posed herein, namely, that plaintiff is entitled to relief, forecloses that argument by defendants and supports the calling and constitution of the three-judge court in this case.

long that they [had] * * * become infested with rodents. * * *[5]

In response to those and related problems, the Maryland legislature enacted in 1969 a comprehensive program designed "to halt the growth of this trend and to induce recycling of vehicles which had fallen into disuse." *Id.* That legislation, and subsequent amendments thereto, have contained three essential and interrelated provisions. First, auto wreckers[6] and *scrap processors*[7] who wish to dispose of abandoned vehicles in Maryland are required to be licensed by the State.[8] Second, such auto wreckers are required to pay a semiannual assessment upon vehicles older than ten model years which remain in their possession for more than one year.[9] Third, the payments of certain bounties will be made by the State upon the destruction of certain vehicles formerly titled in Maryland.[10]

Section 5–201 (1973 Repl.Vol.) provides as follows:

It is unlawful for any person, firm, or corporation, on and after January 1, 1970, to store any vehicle, or body or chassis thereof, which is to be scrapped, dismantled, or destroyed, on any private property for a period in excess of thirty days, unless the person, firm, or corporation is licensed as a wrecker, as hereinafter provided, or operates an establishment as a scrap processor.

From and after January 1, 1970, licenses for scrap processors and wreckers shall be issuable only to those persons, firms, or corporations as those terms are defined in § 5–201.1.[11]

To obtain a license pursuant to section 5–201, a wrecker or scrap processor must comply with the requirements set forth in section 5–202.[12] Those statuto-

---

5. "Prior to the 1969 enactment, wreckers and scrap processors were the subjects of modest regulation under the Motor Vehicle Code, and surely were not part of a comprehensive scheme." *Vogt, supra* at 667, 299 A.2d at 5.

6. Section 5–201.1(b) (1970 Repl.Vol.) provides:
 (b) *"Wrecker"* means every person, firm, or corporation engaged in the business of purchasing or otherwise acquiring vehicles for the benefit of the materials contained therein or parts thereof. [Emphasis in original.]

7. Section 5–201.1(a) provides:
 (a) *"Scrap processor"* means an establishment having facilities for processing iron, steel and nonferrous scrap metal and whose principal product is scrap iron, steel and nonferrous scrap for sale for resmelting purposes only which is licensed under the provisions of this part. [Emphasis in original.]

8. *See* section 5–201, discussed *infra* at p. 49.

9. *See* section 5–203, discussed *infra* at p. 50.

10. *See* section 5–205, discussed *infra* at pp. 50, 51.

11. *See* n. 5 and n. 6.

12. That statute provides:
 (a) No wrecker or scrap processor shall be entitled to obtain a license unless:
 1. Application for a license shall be made to the Administration on forms prescribed by it.
 2. The applicant's business is conducted at a fixed location;
 3. The applicant's storage area is sufficient to accommodate at least twenty-five (25) vehicles to be scrapped, dismantled, or destroyed;
 4. The applicant maintains a substantial office in which books of account and records of such business are kept;
 5. The applicant has erected a substantial and legible sign, in a location on the site of the place of business readily seen by the public, advertising the type of business conducted at such location;
 6. The fee of $15 is paid to the Administration for the issuance of such wrecker's license and a fee of $100 is paid to the Administration for the issuance of such scrap processor's license. Said licenses to be renewed annually;
 7. A copy of the application shall be submitted to the State Department of Health and Mental Hygiene for its comments on matters pertaining to air pollution and health generally.
 8. In the case of a scrap processor, he maintains a hydraulic baler and shears, or

ry requirements in no way differentiate between scrap processors with plants physically located in Maryland and others with no plants so situated. An administrative regulation pursuant to that statute does, however, require that the latter class of processors maintain an office within Maryland. M.A.R.R. 11.02.-05.45.[13]

Pursuant to the provisions of section 5–203(a),[14] a licensed auto wrecker who places a vehicle in his inventory must report that fact to the State Motor Vehicle Administration (hereinafter MVA) within thirty days of acquisition. Thereafter, pursuant to section 5–203(d)[15] a wrecker is subjected to a $5 assessment every six months for each vehicle more than ten years old which has remained in his possession longer than one year. The parties hereto agree that that assessment requirement has had the salutary effect of encouraging the removal of some hulks from automobile graveyards and of limiting the growth of auto wrecker yards. However, they also agree that the assessment provision, standing by itself, has the inevitable effect of discouraging auto

wreckers from picking up older vehicles —an effect which would run counter to the objectives of the total legislative scheme. Accordingly, in order to provide the wreckers with an incentive, a bounty program was established by section 5–205 which provides:

The Administration shall pay a fee of sixteen dollars ($16.00) for each vehicle which has been completely destroyed upon presentation by the scrap processor to the Administration of the certificate of title or other acceptable evidence of ownership for a vehicle formerly titled in this State, the manufacturer's serial or identification number plate, satisfactory proof that the vehicle has been completely destroyed and any other information the Administration may deem necessary. In all cases where one of the counties of this State or Baltimore City receives reimbursement for a vehicle pursuant to the provisions of § 11–1002.2 of this article, the Administration shall pay the above fee even if the vehicle totally destroyed was never titled in this State. The Administration shall disburse this fee in

a shredder, or such other equipment suitable for processing motor vehicle scrap as required by regulation of the Administration.

(b) A fee of $1.00 shall be paid and shall accompany an application for a duplicate wrecker's or scrap processor's license on forms prescribed by the Administration.

13. That regulation states:
The State Motor Vehicle Administration in the exercise of its administrative discretion, may license scrap processors not geographically located within the boundaries of the State of Maryland, provided that such scrap processor maintains an office in the State of Maryland, that shall be approved by this agency.

14. That statute provides:
(a) *Notice of acquisition of vehicle.*—Every wrecker engaged in the business of purchasing or otherwise acquiring vehicles for the purpose of scrapping, dismantling, or destroying, shall notify the Administration of the acquisition of such vehicles upon forms prescribed by the Administration within thirty (30) days of the date of acquiring such vehicles.

15. (d) *Authority of Administration to prescribe forms and promulgate rules and regulations.*—The Administration shall prescribe forms and have the authority to promulgate rules and regulations pertaining to the manner in which a wrecker or scrap processor notifies the Administration of receipt of a vehicle or body or chassis thereof to be scrapped, dismantled, or destroyed and the manner in which an assessment is placed upon a wrecker if a vehicle or body or chassis thereof has a designated model year in excess of ten years, as determined by a national publication of used car values adopted for use by the Administration is not scrapped, dismantled, or destroyed within one year from the date a wrecker acquires possession of the vehicle or body or chassis thereof, and the assessment shall be in the amount of $5 for each and every six (6) month period the vehicle or body or chassis thereof remains not scrapped, dismantled, or destroyed. For the purpose of administering this subsection as it relates to assessments, vehicles shall not include trucks, truck tractors or trailers.

the following manner: Eight dollars ($8.00) to a scrap processor and eight dollars ($8.00) to the wrecker conveying ownership of the vehicle to be destroyed to such scrap processor. Scrap processors and wreckers must be licensed under this part to be eligible for this fee. No fee shall be paid by the Administration for any vehicle destroyed by any scrap processor prior to July 1, 1970, and the Administration shall require satisfactory evidence confirming the date that such vehicle was destroyed in the form and manner prescribed by the Administration.[16]

The parties agree that the availability of the "bounty" payments results in an artificially enhanced value for abandoned hulks, that is, a value in excess of their normal market prices. Licensed wreckers benefit directly from the bounty which they are statutorily entitled to share. Non-licensed wreckers or towers are, however, also benefited because, as the parties hereto agree, while non-licensed wreckers are not statutorily entitled to a share of the bounty, the availability of such a bounty to the processor enables a processor to pay an increased price for an automotive hulk to all wreckers, licensed or unlicensed, and that in fact as a matter of custom processors do rebate a substantial portion of the bounty to all wreckers as an incentive for future deliveries.

To receive any bounty pursuant to section 5–205, a processor must present to the MVA, *inter alia*, "the certificate of title or other acceptable evidence of ownership for a vehicle formerly titled in this State". Prior to July 1, 1974, in apparent recognition that the free transfer of abandoned vehicles was in part impeded by fears on the part of scrap processors and auto wreckers of potential claims against them by owners or alleged owners of abandoned vehicles, there existed four methods pursuant to which a licensed scrap processor could receive a bounty payment and acquire ownership of an abandoned vehicle without receiving a certificate of title. First, an abandoned vehicle could be taken into custody by local police and sold after due notice.[17] Second, the police

16. Under the bounty program, an auto wrecker, when reporting his inventory of vehicles monthly to the MVA, receives a four-part Certificate of Disposal for each vehicle. The wrecker retains that Certificate in his file until he elects to dispose of the vehicle to a scrap processor, at which time the wrecker assigns the Certificate to the processor and furnishes the latter with two of the four copies. The third copy goes into the auto wrecker's file; the fourth copy is sent to the MVA as a report that the vehicle is no longer in the inventory of the wrecker. That relieves the auto wrecker of the $5 assessment. Upon receipt of the vehicle and two copies of the Certificate of Disposal, the processor destroys the vehicle, certifies its destruction on one of two certificates, and forwards the certificate to the MVA for payment of the bounty.

17. Section 11–1002.2(a)–(d) provides:

(a) *Notice to last known registered owner.*—A police department which takes into custody an abandoned motor vehicle shall, as soon as reasonably possible and in any event within seven days thereof, by registered mail, return receipt requested, signed by the addressee, notify the last known registered owner of the motor vehicle and all lienholders as shown on the records of the Department that the vehicle has been taken into custody. The notice shall describe the year, make, model, and serial number of the abandoned motor vehicle; set forth the location of the facility where the motor vehicle is being held, inform the owner and any lienholders of their right to reclaim the motor vehicle within three weeks after the date of the notice, upon payment of all towing, preservation and storage charges resulting from placing the vehicle in custody, and state that the failure of the owner or lienholders to exercise their right to reclaim the vehicle within the time provided shall be deemed a waiver by the owner and all lienholders of all right, title, and interest in the vehicle and consent to the sale of the abandoned motor vehicle at a public auction.

(b) *Notice by publication.*—If the identity of the last registered owner cannot be determined, or if the registration contains no address for the owner, or if it is impossible to determine with reasonable certainty the identity and addresses of all lienholders, or if the registered mail notice required by subsection (a) of this section is returned as undeliverable, notice by one

could issue to a scrap processor or wrecker a certificate of authority to sell or otherwise dispose of a vehicle to "[a]ny person, firm, corporation, or unit of government upon whose property or in whose possession is found any abandoned motor vehicle, or any person being the owner of a motor vehicle whose title certificate is faulty, lost or destroyed * * * ".[18] Third, pursuant to section

publication in one newspaper of general circulation in the area where the motor vehicle was abandoned shall be sufficient to meet all requirements of notice pursuant to this section. The notice by publication may contain multiple listings of abandoned vehicles. Such notice shall have the same contents as those required by registered mail, and shall be published within fifteen days of the taking into custody of the motor vehicle except that in the case of said notice by reason of the return as undeliverable of notice by registered mail the notice shall be published within seven days of such return.

(c) *Effect of failure to reclaim vehicle.* —The consequences and effect of failure to reclaim an abandoned motor vehicle shall be as set forth in a valid notice given pursuant to subsections (a) and (b).

(d) *Sale; disposition of proceeds.*—If an abandoned motor vehicle has not been reclaimed as provided for in subsections (a) and (b), the police department shall sell it at public auction. The purchaser of the motor vehicle shall take title to the motor vehicle free and clear of all liens and claims of ownership, shall receive a sales receipt from the police department, and shall be entitled to register the purchased vehicle and receive a certificate of title. The sales receipt at such a sale shall be sufficient title only for purposes of transferring the vehicle to a scrap processor for demolition, wrecking, or dismantling, and in such case, no further titling of the vehicle is necessary. From the proceeds of the sale of an abandoned motor vehicle the police department shall reimburse itself for the expenses of the auction, the costs of towing, preserving, and storing the vehicle which resulted from placing the abandoned motor vehicle in custody, and all notice and publication costs incurred pursuant to subsections (a) and (b), of this section. Any remainder from *the proceeds of a sale* shall be held for the owner of the vehicle or entitled lienholder for ninety days, and then shall be deposited with the State Treasurer in the Abandoned Vehicles Fund, as provided for in § 3-830.

Whenever the proceeds of a sale of such other abandoned vehicles are not sufficient to meet the expenses incurred, the Administration shall reimburse the several counties of the State and Baltimore City the sum of ten dollars ($10.00) from the fund established in § 3-830 of this article for each vehicle taken into custody by a county, or Baltimore City, when such vehicle is sold for the purpose of total destruction and when acceptable evidence is presented to the Administration that such vehicle has been totally destroyed.

The reimbursement of expenses from the Abandoned Vehicles Fund to the several counties and Baltimore City shall only apply to abandoned vehicles which are removed from public or private property of this State on and after July 1, 1972.

18. Section 11-1002.2(f) provides, in pertinent part:

(f) *Disposition of vehicle to scrap processor or wrecker.*—(1) Any person, firm, corporation, or unit of government upon whose property or in whose possession is found any abandoned motor vehicle, or any person being the owner of a motor vehicle whose title certificate is faulty, lost or destroyed, may apply to the police department of the jurisdiction in which the vehicle is situated for authority to sell, give away or dispose of the vehicle to a scrap processor or wrecker.

(2) The application shall set out the name and address of the applicant, the year, make, model, and serial number of the motor vehicle, if ascertainable, together with any other identifying features, and shall contain a concise statement of the facts surrounding the abandonment, or that the title of the motor vehicle is lost or destroyed, or the reasons for the defect of title. The applicant shall execute an affidavit stating that the facts alleged therein are true and that no material fact has been withheld.

(3) If the police department finds that the application is executed in proper form and shows that the motor vehicle has been abandoned upon the property of the applicant, or if it shows that the motor vehicle is not abandoned but that the applicant appears to be the rightful owner, the police department shall follow the notification procedures set forth in subsections (a) and (b) of this section.

(4) If an abandoned motor vehicle is not reclaimed in accordance with subsections (a) and (b), the police department shall give the applicant a certificate of authority to sell the motor vehicle to any wreck-

5–203(b) [19] a wrecker could acquire "possession of a vehicle * * * for which there is no certificate of title, or certificate of authority * * *" and could, after the vehicle had been in his possession more than thirty days and after proper notice to the MVA, dispose of the same by sending a "notice of intent to dispose of the vehicle * * * to the owner and any lienholder as shown on the records of the Administration or any other person entitled to possession of the vehicle * * *, if his address is known or can be reasonably obtained." If the vehicle was over eight years old and "totally inoperable", however, no such notice needed be given except to the owner. The statute provided however that if the owner or such other person "fails to recover or claim the vehicle * * * within the ten (10) day period specified" in the notice, the wrecker "shall take and assume free and clear title to the said vehicle * * *".[20]

Additionally, and further, prior to July 1, 1974, section 11–1002.2(f)(5) provided:

Notwithstanding any other provisions of this section, any person, firm, corporation, or unit of government upon whose property or in whose possession any abandoned motor vehicle is found, or any person being the owner of a motor vehicle whose title certificate is faulty, or destroyed, or any agent designated and authorized by a unit of government to remove an abandoned motor vehicle from public or private property, may dispose of the motor vehicle to a wrecker or scrap processor without the title and without notification procedures of subsections (a) and (b) of this section, if the motor vehicle is over eight

---

er or scrap processor for demolition, wrecking, or dismantling. The wrecker or scrap processor shall accept such certificate in lieu of the certificate of title to the motor vehicle.

19. That statute provides:

(b) *Notice of intent to dispose of vehicle.*—If a wrecker acquires possession of a vehicle, or body or chassis thereof, for which there is no certificate of title, or certificate of authority and the vehicle, or body or chassis thereof, has been in the possession of the wrecker for a period of more than thirty (30) days, the wrecker shall send a notice of intent to dispose of the vehicle, or body or chassis thereof, at least ten (10) days prior thereto by registered mail to the owner and any lienholder as shown on the records of the Administration or any other person entitled to possession of the vehicle, or body or chassis thereof, if his address is known or can be reasonably obtained.

The provisions of this section which relate to the period of possession on the records of the Administration or any other person entitled to pos [sic] of a vehicle and the notification procedure shall not apply to abandoned vehicles which are over eight (8) years old and are totally inoperable.

20. Section 5–203(c) (1970 Repl.Vol.) provides:

(c) *When wrecker may assume ownership of vehicle without certificate of title.*—If the owner of the vehicle, or body or

chassis thereof, or any other person entitled thereto, or any lienholder having an interest therein fails to recover or claim the vehicle, or body or chassis thereof, within the ten (10) day period specified in the aforementioned notice, the wrecker having possession of the vehicle, or body or chassis thereof, shall take and assume free and clear title to the said vehicle, or body or chassis thereof, without the necessity of securing a certificate of title, as is required by the provisions of this article. The assumption of ownership by the wrecker shall be certified on forms prescribed by the Department and forwarded to it within five (5) days from the date ownership has been assumed by the wrecker.

If the address of the owner, lienholder, or any other person entitled to possession of the vehicle, or body or chassis thereof, for which there is no certificate of title, cannot be reasonably obtained from the records of the Department, or by the exercise of reasonable diligence, the wrecker having possession of the vehicle or body or chassis thereof shall take and assume free and clear title to the vehicle, or body or chassis thereof, after the aforementioned thirty (30) day period. The assumption of ownership by the wrecker shall be certified on forms prescribed by the Department and forwarded to it within five (5) days from the date ownership was assumed by the wrecker.

years old and has no engine or is otherwise totally inoperable.

In its 1974 session, the General Assembly of the State of Maryland left unchanged the first three said methods, but changed the fourth method by amending section 11–1002.2(f)(5) to add the following language:

In those cases only *a scrap processor whose plant is physically located and operating in this State* shall execute an indemnity agreement that shall be filed with the Motor Vehicle Administration. The indemnity agreement shall contain the name, address and signature of the person delivering the vehicle. The indemnity agreement and the manufacturers serial or identification number shall be satisfactory proof that the vehicle has been destroyed and shall be acceptable for payment of the full bounty authorized by § 5–205 if the vehicle identified in the indemnity agreement was titled in this State. Otherwise, for the purpose of administering the provisions of this section, the provisions of § 5–205 shall not apply. [Emphasis supplied.] [21]

Under the 1974 amendment, a scrap processor with no plant physically located and operating within Maryland continues to be able to participate in Maryland's bounty program. However, such processor, unlike a processor with a plant physically located and operating within Maryland's boundaries, may not obtain any bounty for the destruction of an abandoned vehicle over eight years old by simply filing an indemnity agreement. Further, the statute, as amended in 1974, may well afford to an in-state processor statutory protection from claims of owners or alleged owners if he obtains an indemnity agreement. By way of contrast, pursuant to the 1974 amendment, a nonresident processor would not appear entitled to receive that protection even if he has obtained an indemnity agreement.

B. *The Status of Plaintiff*

Plaintiff, a licensed scrap processor since the inception in 1969 of Maryland's abandoned vehicle legislation (Stipulations 3, 7; Exh. A thereto), is one of sixteen licensed processors and one of seven such processors with no physical plant located in Maryland (Stipulation 9). Plaintiff maintains an office in Silver Spring, Maryland, where it keeps records relating to its Maryland business (Stipulation 8). Plaintiff ranks third among the sixteen processors currently licensed by Maryland in terms of bounty payments received. Through September 30, 1974, plaintiff had received $219,084 in such payments, representing approximately 13.7% of all such payments made by the MVA since the program's inception (Stipulation 13).

## II. THE PROPRIETARY–GOVERNMENTAL DISTINCTION

 The State of Maryland contends that its activities in seeking to rid the State of abandoned vehicles are not subject to constitutional limitations imposed by either the Commerce Clause or the Equal Protection Clause of the Fourteenth Amendment because those activities are not normal activities of a government but rather fall into the category of those activities in which a government acts as does a businessman.

Governments in the United States traditionally possess two kinds of

21. Prior to July 1, 1974, scrap processors required persons delivering to them vehicles for destruction to execute so-called "indemnity agreements" unless the vehicle was accompanied by a title certificate. By executing such an agreement, a transferor certified that he had legal ownership of and authority to deliver the vehicle, agreed to indemnify the scrap processor from all liability for claims arising from destruction of the vehicle, and warranted compliance with all Maryland laws and regulations. (Stipulation 14). Prior to July 1, 1974, such indemnity agreements may have been of questionable legal effect. In any event there is seemingly no reference in the pre-1974 Maryland statutory scheme to indemnity agreements.

power: one, governmental or public, in the exercise of which it is a sovereign and governs its people; the other, proprietary or business, by means of which the government acts and contracts for the private advantage of its constituents and of the government itself. Each of these types of power is limited by distinct sets of rules. In order to protect the rights and freedoms of private citizens from oppressive interference, the power of a state to govern is restricted by its own constitution and provisions of the federal constitution as well. When the state exercises its proprietary or business power, however, it is subject to no more limitation than a private individual or corporation would be in transacting the same business. While the line between governmental and proprietary function is none too sharply drawn and is subject to modification as concepts of government are changed to meet the demands of society, one principle remains fixed: the letting of public contracts, particularly those providing for internal needs of government, is a proprietary function. * * * [Footnotes omitted.]

American Yearbook Co. v. Askew, 339 F.Supp. 719, 721 (M.D.Fla.), aff'd, 409 U.S. 904, 93 S.Ct. 230, 34 L.Ed.2d 168 (1972); cf. Town of Graham v. Karpark Corp., 194 F.2d 616, 620 (4th Cir. 1952); Krisel v. Duran, 258 F.Supp. 845, 853 (S.D.N.Y.1966) (Weinfeld, J.), aff'd per curiam, 386 F.2d 179 (2d Cir. 1967).

In *American Yearbook, supra,* a Florida statute requiring all of the State's public printing to be done in Florida was upheld as a valid exercise of the State's proprietary power. In so doing, the three-judge court relied in part upon Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148 (1903), which involved a Kansas statute prohibiting persons performing contracts entered into with the State of Kansas from requiring or allowing their employees to work in excess of eight hours a day on work connected with those contracts. Atkin, an

employer charged with violating that statute, contended that he had been denied equal protection of the laws since employers not performing work under and connected with state contracts were not similarly restricted. In upholding the Kansas statute, Mr. Justice Harlan wrote (at 224, 24 S.Ct. at 128):

> * * * We rest our decision upon the broad ground that the work being of a public character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done. Its action touching such a matter is final so long as it does not, by its regulations, infringe the personal rights of others; and that has not been done.

The line between proprietary and governmental functions is by no means a precise one. As Judge Tjoflat observed (339 F.Supp. at 721) in *American Yearbook, supra,* it is a line "subject to modification as concepts of governments are changed to meet the demands of society * * *". Fortunately, in the context of this case, it is also a line which need not be determined with surveyor-like precision. Pursuant to Maryland's abandoned vehicle legislation as enacted in 1969 and as amended thereafter, the State has not chosen to contract in a business context with scrap processors and to specify conditions with respect to the latters' performance of such contracts. Rather, in electing to act as it did in exercising its police power to preserve the State's natural resources, the State elected to act in a traditional governmental capacity. While defendants contend that the 1969 legislation as amended has not been enacted pursuant to the State's police power, that contention comports neither with established legal principles nor with the facts. *See generally* Potomac Sand & Gravel Co. v. Governor, 266 Md. 358, 373, 293 A.2d 241 (1972). *And see particularly* Administrator, Motor Vehicle Administra-

tion v. Vogt, 267 Md. *supra* at 675, 299 A.2d at 9 in which Judge Levine wrote:

> "Although the question of whether this enactment constituted a reasonable exercise of the police power is not before us, the testimony clearly established that for reasons of environmental health, the legislation was designed to arrest the increasing accumulation of automobile hulks, and to promote their recycling."

### III. EQUAL PROTECTION STANDARDS

■ A legislative program which does not operate in an area of fundamental interests or restrict fundamental rights is to be accorded broad deference under the Equal Protection Clause.

> "1. The equal protection clause of the Fourteenth Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 79, 31 S.Ct. 337, 340, 55 L.Ed. 369 [1911].

Morey v. Doud, 354 U.S. 457, 463–64, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). *Accord*, Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *see also* Village of Belle Terre v. Boraas, 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); Reed v. Reed, 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L. Ed.2d 225 (1971); Ferguson v. Skrupa, 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L. Ed.2d 93 (1963); McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). In that last cited case, Mr. Chief Justice Warren, writing in the touchy context of rejecting a challenge to Maryland's Sunday Blue Laws, observed (at 425–26, 81 S.Ct. at 1105): "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." But in spite of the considerable deference to be accorded statutory discriminations, particularly those operating in a purely economic arena, Mr. Justice Burton, in the course of holding an Illinois statute violative of equal protection principles, made clear in Morey v. Doud, *supra* (354 U.S. at 466, 77 S.Ct. at 1350) that "distinctions in the treatment of business entities engaged in the same business activity * * * * cannot be * * * justified if the 'discrimination has no reasonable relation to these differences.' * * *" (citation omitted). Similarly, Mr. Chief Justice Burger has indicated in Reed v. Reed, *supra*, 404 U. S. at 76, 92 S.Ct. at 254, that in general, in the framework of equal protection principles, though not in the context of a business-type case, "[a] classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S. Ct. 560, 561, 64 L.Ed. 989 (1920)." *See* Dukes v. City of New Orleans, 501 F.2d 706, 709–11 (5th Cir. 1974) (Goldberg, J.).

■ Defendants argue that the 1974 amendment should be sustained because it serves two state interests: (1) it limits the payment under Maryland's bounty program to Maryland vehicles abandoned within the State; and (2) it in-

sures that bounty recipients are fully subject to the laws of Maryland and available to its judicial process. But neither of those two interests are in any rational manner advanced by the 1974 amendment. The State's interest in assuring that bounty recipients be fully subject to its laws and process does not require that such a recipient have a physical plant located within Maryland. A processor such as Alexandria Scrap must, before it is licensed by Maryland as a scrap processor, establish a records type office in Maryland and submit to periodic inspection by Maryland officials of its records, *see* §§ 5–206,[22] 5–207,[23] and M.A.R.R. 11.02.05.36 & .43.[24] Moreover, such a processor transacts sufficient business in Maryland so as to be within reach of Maryland's "long arm" statute, Md.Ann. Code Cts. & Jud.Proc. art., § 6–103(b)(1) (1974),[25] and, in addition, could seemingly be required by Maryland, before the payment to such processor of any bounty, contractually to agree to submit to Maryland's jurisdiction.

As to their argument that the 1974 amendment helps limit the payment of its bounty monies to vehicles abandoned within the state boundaries, defendants have not proffered a scintilla of factual support for their assumption that non-resident processors are more likely than in-state processors to claim bounties for vehicles abandoned outside of Maryland. Although defendants have suggested that plaintiff has submitted to the MVA several indemnity agreements indicating the origin of a destroyed vehicle to have been the District of Columbia (Affidavit of Thomas E. Harris, Chief of the Licensing and Consumer Services Division of the MVA, Para. 5), there is no indication that MVA has ever informed any licensed processor that bounties may not be collected for such vehicles. Nor is there any statutory or administrative requirement, or any practice, which provides that there be set forth in an indemnity agreement the source of the abandoned vehicle. All that is needed is that the vehicle have been a Maryland-titled vehicle. Moreover, the provisions of the amendment in no way include any requirement that a Maryland-titled vehicle be abandoned within rather than without Maryland in order to qualify for a bounty. Defendants urge that that requirement is "implicit" in the 1974 amendment and that that statutory enactment, at the worst, should be construed as an inartfully drafted, eleventh hour provision. But no such urging can alter the clear and contrary meaning of the terms of the amendment itself. It is

---

22. Section 5–206 provides:

A wrecker and a scrap processor shall keep an accurate and complete record of all motor vehicles purchased or received by him in the course of his business. These records shall contain the name and address of the person from whom each motor vehicle was purchased or received and the date such purchases or receipts occurred and such other information that may be required by the Department. The records shall be open for inspection by a police department at any time during normal business hours. Any record required by this section shall be kept by the scrap processor for at least three years after the transaction to which it applies.

23. Section 5–207 provides:

The Department may promulgate other rules and regulations and prescribe forms necessary to administer the provisions of this part relating to wreckers and scrap processors.

24. Those two regulations respectively provide:

.36 Each scrap processor's location shall be subject to inspection by an authorized representative of the State Motor Vehicle Administration prior to the issuance of such license.

.43 The premises and books and records regarding purchases, sales, transfers of ownership and other related material shall be available for inspection by an authorized representative of the State Motor Vehicle Administration or law enforcement agencies.

25. Section 6–103(b)(1) provides:

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the state; * * *.

also to be noted that under the Maryland statutory scheme as currently amended, a processor which is essentially an out-of-state processor and which has its principal plant out of state could, if it desired, go to the expense of erecting a costly processing facility within the State, and then proceed to scrap vehicles in connection with which bounties are claimed and indemnity agreements are entered into, at either or both of its in-state and out-of-state plants. In any event there is no indication that the fact that a processor has an in-state plant will likely affect the sources of the vehicles.

The theoretical possibility of course exists that the in-state facilities of processors could be inspected more conveniently by Maryland officials. In that connection those officials would have the support of Maryland's law enforcement bodies to conduct such inspections within the State. However, in oral argument to this Court, counsel for the State candidly stated that the MVA possesses sufficient power to enforce its inspection requirements against a nonresident processor by stripping the latter of its license;[26] that the State has not to date physically inspected the facilities of in-state processors for evidence of fraud in connection with indemnity agreements; and that such inspection would reveal little or nothing of value to an inspector which could not be determined from an inspection of records.[27] In that latter regard it has been pointed out that under normal operating procedures, vehicle identification plates are detached from abandoned vehicles before those vehicles are delivered to a processing plant. See Harris Affidavit, Para. 7. Thus, inspection at a processing plant would not reveal the source of an abandoned vehicle. And, finally, counsel for the State during oral argument stated to this Court

that the statutory discrimination between in-state and nonresident processors had in no way been premised by the state legislature upon the greater inspection opportunities available as to the in-state processor.

In this case, the 1974 amendment does not, as applied, protect a "closed class" of scrap processors. Indeed, plaintiff does not suggest that any processor has been explicitly favored by the 1974 legislation as was the case in *Morey, supra,* or that any one processor has been exclusively benefited thereby as was the case in Dukes v. City of New Orleans, *supra* at 712. However, the cost of the heavy equipment required to set up a scrap processing plant does have the practical effect of discouraging the entry of new competitors. Stipulation 10. In that connection plaintiff has alleged that two named corporations with extensive Maryland operations are deriving special advantages from the 1974 amendment. Disregarding that allegation and with every due regard to the liberal equal protection standards set forth in *Morey* and in many other cases, the 1974 amendment cannot withstand plaintiff's equal protection attack. Given, in the current summary judgment posture of this case, every factual inference in its favor, that statutory provision creates a classification which has no basis in reason. Accordingly, the 1974 amendment cannot withstand the within equal protection challenge.

## IV. COMMERCE CLAUSE ANALYSIS

▮ Nor can the 1974 amendment survive scrutiny under well-established Commerce Clause principles.

Buying for shipment, and shipping, to markets in other states * * * constitutes interstate commerce,—the

26. Section 5–601 provides:
 The Department may refuse, suspend, or revoke any license issued under this article relating to wreckers and scrap processors if the Department finds that the licensee is violating any provisions of this article or the applicable rules and regula-

tions promulgated by it or the State Department of Health.

27. The State has also stated that it has not to date required nonresident processors even to keep their records at the office it requires them to maintain within the State.

buying being as much a part of it as the shipping. * * *

Shafer v. Farmers Grain Co., 268 U.S. 189, 198, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925). The movement of automobile hulks across state lines constitutes interstate commerce.[28] Further, such movement is but a prelude to the movement of processed scrap to steel mills throughout the country.[29] The power to regulate interstate commerce is expressly confided to the federal Congress pursuant to the Commerce Clause. But in the absence of congressional legislation, "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it. * * * " Southern Pacific Co. v. State of Arizona ex rel. Sullivan, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945). In the wrecked vehicles field of business no congressional legislation has preempted state action. Accordingly, the test by which the validity of Maryland's legislation must be measured is that set forth by Mr. Justice Stewart in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. Huron Portland Ce-

ment Co. v. City of Detroit, 362 U.S. 440 [443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, Southern Pacific Co. v. Arizona, 325 U.S. 761 [65 S.Ct. 1515, 89 L.Ed. 1915], but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens. See, e. g., Shafer v. Farmers Grain Co., supra.

Mr. Justice Jackson, referring to an earlier opinion by Mr. Justice Cardozo in Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), wrote that in *Baldwin* Mr. Justice Cardozo recognized a "broad power in the State to protect its inhabitants against perils to health or safety, fraudulent traders and highway hazards even by use of measures which bear adversely upon interstate commerce. But it [Mr. Justice Cardozo's opinion in *Baldwin*] laid repeated emphasis upon the principle that the State may not promote its own economic advantages by curtailment or burdening of interstate commerce." H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 531–32, 69 S.Ct. 657, 662, 93 L.Ed. 865 (1949). Thus, even local health or safety measures which impose upon interstate commerce a burden disproportionate to the benefits of that legislation to the interests it purports to serve, may be declared invalid under the

---

**28.** Plaintiff herein has asserted, for example, that 40% of its total requirement for unprocessed scrap is satisfied by vehicles delivered from Maryland and that a substantial part of the plaintiff's dealings with old cars is derived from plaintiff's operations related to the Maryland statute. Defendants have not admitted those allegations but even so it is apparent that the movement of vehicles across state lines involving plaintiff is substantial.

**29.** *Cf.* Allenberg Cotton Co. v. Pittman, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974); Hackensack Meadowlands Development Commission v. Municipal Sanitary Landfill Authority, 127 N.J.Super. 160, 316 A.2d 711, 716 (1974).

Commerce Clause.[30] Therefore, plaintiff's challenge to the 1974 amendment based upon its claimed unconstitutional conflict with the Commerce Clause must be cautiously evaluated.

> "One challenging the validity of a state enactment on the ground that it is repugnant to the commerce clause is not necessarily bound by the legislative declarations of purpose. It is open to him to show that in their practical operation its provisions directly burden or destroy interstate commerce. * * *"

Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 5, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147 (1928). In Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), the Court upheld a challenge to an ordinance of the City of Madison, Wisconsin which prohibited the sale of milk as pasteurized unless that milk was pasteurized and bottled within five miles of the City's central square. In response to the City's argument that the ordinance was aimed simply at protecting the health of the community, Mr. Justice Clark noted (at 354, 71 S.Ct. at 298) that to sustain an ordinance simply because it denominates itself "a health measure, would mean that the Commerce Clause of itself imposes no limitations on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods. * * *" Since the practical effect of the ordinance challenged in *Dean Milk* was to protect local industry, the Court struck down the ordinance.

■ Additionally, any evaluation of the validity of the impact of a state statute upon interstate commerce depends not only upon the strength of local interests, but upon whether those interests can be promoted by other means. It is perhaps thus well to repeat Mr.

Justice Stewart's statement in Pike v. Bruce Church, Inc., 397 U.S. *supra* at 142, 90 S.Ct. at 847, quoted at p. 59, *supra*, that—

> * * * the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. * * *

To the same effect, *see* Dean Milk Co. v. Madison, 340 U.S. *supra* at 354, 71 S. Ct. at 298, in which the Court stated that a statute erecting barriers to out-of-state competition is invalid "if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available. * * *"

■ Further, a state may not permissibly require "an out-of-state operator to become a resident in order to compete on equal terms". Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 72, 83 S.Ct. 1201, 1205, 10 L.Ed.2d 202 (1963). *See also* Pike v. Bruce Church, Inc., 397 U.S. *supra* at 138, 90 S.Ct. 844, in which, in order to implement an Arizona statute which, *inter alia*, regulated packaging of all cantaloupes grown in Arizona, an Arizona official issued an Order "prohibiting" Bruce Church, Inc. "from transporting uncrated cantaloupes" from Arizona to California "for packaging and processing." The effect of that prohibition was that the company, in order to continue in its business, would have been required to erect packing facilities within Arizona at a substantial additional cost. Because the burden that prohibition placed upon interstate commerce was not deemed outweighed by Arizona's interest in identifying the source of the fruit, that prohibition was declared invalid. In his opinion for the Court, Mr. Justice Stewart declared (at 145, 90 S. Ct. at 849) that—

---

30. *See* Southern Pacific Co. v. State of Arizona ex rel. Sullivan, *supra*, for an example of invalid state legislation. In that case, a train length limit on interstate trains was invalidated upon a showing that its adverse impact on the efficiency and economy of interstate transportation outweighed its marginal value as a safety measure.

\* \* \* the Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually per se illegal. Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1 [49 S.Ct. 1, 73 L.Ed. 147 (1928)] \* \* \*.

Mr. Justice Stewart concluded (at 146, 90 S.Ct. 844) that Arizona's "interest" in what it was seeking to accomplish was too "minimal" to permit it to burden Bruce Church to the extent involved.

In H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. supra, Mr. Justice Jackson, after stating (at 533, 69 S.Ct. at 662) that a " \* \* \* distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law", noted (at 535, 69 S.Ct. at 663) that the Supreme Court had "consistently \* \* \* rebuffed attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety." Pursuant to that reasoning, the Supreme Court has also invalidated state laws which have placed local business in a position of economic isolation from competition with the products or labor of other states, see, e. g., Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 377, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964), holding invalid Florida regulations having the effect of requiring Florida milk distributors to accept milk from local producers.

There is a line of authority which holds that a state can preserve for and allocate to its own citizens "common property" belonging to them. See McCready v. Virginia, 94 U.S. 391, 395–97, 24 L.Ed. 248 (1877), dealing with Virginia's oysters. But there are tight limitations woven around that doctrine. See Toomer v. Witsell, 334 U.S. 385, 404–06, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (Vinson, C. J.); id. at 408, 68 S. Ct. 1156 (Frankfurter, J., concurring for himself and Jackson, J.), in which a South Carolina statute was held repugnant to the Commerce Clause; and Foster-Fountain Packing Co. v. Haydel, 278 U.S. supra at 11, 49 S.Ct. 1, in which Mr. Justice Butler, in the course of similarly invalidating a Louisiana statute, wrote (at 13, 49 S.Ct. at 4):

\* \* \* As the representative of its people, the state might have retained the shrimp for consumption and use therein. But, in direct opposition to conservation for intrastate use, this enactment permits all parts of the shrimp to be shipped and sold outside the state. The purpose is not to retain the shrimp for the use of the people of Louisiana; it is to favor the canning of the meat and the manufacture of bran in Louisiana by withholding raw or unshelled shrimp from the Biloxi plants. \* \* \* In this case, even if by some stretch of the imagination the bounty payments can be deemed "common property", similar to the oyster beds in McCready, or the shrimp in Toomer and Foster-Fountain, it is to be noted that the Maryland abandoned auto program as originally commenced in 1969 did not treat the bounties as "common property" which Maryland was going to distribute to Marylanders only, and that that program began to prefer Marylanders only when the 1974 amendment was adopted.

The foregoing principles establish the repugnancy of the 1974 amendment to the Commerce Clause of the federal Constitution. The effect of that amendment is substantially to bur-

den the flow of interstate commerce by promoting the economic advantages of scrap processors with plants in Maryland, who alone, pursuant to that amendment, may receive bounties on inoperable vehicles in excess of eight years of age without any requirement that their suppliers have complied with procedures inevitably consumptive of more time and energy than the filing of an indemnity agreement, and who, as contrasted with processors with only out-of-state plants, are statutorily accorded the immunization against suits by owners or alleged owners of the vehicles to the extent provided by such agreements.

As a result of the 1974 amendment, a licensed wrecker desiring to sell an automobile hulk eight years or older and inoperable but not wishing to comply with statutory notice provisions has two simple choices: he may deliver it to a processor such as plaintiff and receive only its scrap value, or he may deliver it to a processor with a Maryland plant and additionally receive a statutory share of the bounty. Similarly, unlicensed wreckers, who, it should be noted, do not have available the notification procedures available to licensed wreckers pursuant to section 5–203(b), or other individuals desiring to sell such a hulk, may deliver the same to a processor such as plaintiff and receive therefor only its market value; or, they can deliver the same to a processor with an in-state plant who, as a result of the bounty to which he is statutorily entitled, will be able to remit to the deliveror a portion of that bounty. Since the choice between the simple expedient of executing an indemnity agreement and use of the more time-consuming notice procedures will in many, if not all, instances be made by individuals with no interest in maintaining Alexandria Scrap's economic health and a considerable interest in maintaining their own economic health, the choice which will in most instances be made is rather predictable and almost inevitable.

Not only the terms of the 1974 amendment but also the undisputed facts in this case appear to establish that the 1974 amendment has since its enactment imposed substantial burdens upon the free flow of interstate commerce. While, in the current summary judgment posture of this case, the extent to which old cars constitute the lifeblood of the scrap metal industry and the exact percentage of ferrous scrap sold to steel mills represented by vehicles eight years old or older have not been established, the importance of such vehicles to the scrap industry is without doubt substantial. Moreover, it has been stipulated (Stipulation 16) that prior to the 1974 amendment, the police certificate of authority was seldom used to transfer ownership of vehicles eight years old and older. While the State disputes plaintiff's contention that it may take as long as three weeks to obtain such certificates, an affidavit of Mr. Harris, the Chief of the MVA's Licensing and Consumers Service Division, indicates that in four of Maryland's counties nearest to Alexandria, Virginia, namely, Charles, Calvert, Prince George's, and Montgomery, such certificates do require approximately seventy-two hours to obtain (Para. 11). Finally, there has been no challenge by defendants to plaintiff's assertion that plaintiff has informed its suppliers of automobile hulks of the proper procedures necessary to obtain police certificates of authority and has provided those suppliers with the forms necessary to obtain the same, but that since the 1974 amendment those same suppliers are now disposing of their hulks to Maryland processors. Plaintiff, citing figures in support of such contention, claims that the 1974 amendment has "drastically altered the market in eight year old or older motor vehicles formerly titled in Maryland." (Affidavit of Defendant, Para. 12). Plaintiff's own figures appear to some extent to indicate that plaintiff has in some measure been able to replace some of the business it has lost subsequent to the 1974 amendment. Still, those figures reflect not only a reshaping of the abandoned vehicle market but

a discernible diminution in plaintiff's business. But, again, in the summary judgment posture of this case, plaintiff will herein be given no benefit from such factual proffers. Nevertheless the uncontroverted facts do establish that the 1974 amendment has burdened and continues to burden the free flow of interstate commerce in scrap and that that burden outweighs any local health or safety interests furthered by it. While conservation of state funds vis-a-vis claims for bounty for automobiles abandoned outside Maryland, as well as full assurance that participants in that State's bounty program are appropriate subjects for regulation under its laws, pose clearly legitimate state legislative goals, the facts in this case are that those goals are not and cannot be rationally achieved or advanced by the 1974 amendment. Rather, not only does that amendment effectively protect scrap processors with existing plants in Maryland from the pressures of competitors with nearby out-of-state plants, but it implicitly offers to extend similar protection to any competitor who is willing to erect a scrap processing facility within Maryland's boundaries—an offer clearly suspect under Commerce Clause principles. This Court is not bound by the declarations herein by counsel for defendants and other Maryland officials as to the purpose of the Maryland legislature in enacting the 1974 amendment. To begin with, there is no legislative history available. Second, the language of the amendment speaks for itself. And, in any event, those purported purposes could easily have been and indeed still could be accomplished by the simple, nondiscriminatory expedient of denying bounty payments to any processor for any vehicle abandoned outside of Maryland's geographical limits. In sum, the legislation challenged herein cannot survive attack under the Commerce Clause any more than it can withstand challenge under equal protection principles.

## V. RELIEF

The words "whose plant is physically located and operating in this State", as they presently appear in section 11–1002.2(f)(5), shall not hereafter be given any force or effect.[31] Defendants are hereby enjoined from otherwise enforcing that section of the law as presently enacted. An appropriate Order will be filed today in this case.

Plaintiff's motion for summary judgment is hereby granted. Defendants' motion for summary judgment is hereby denied.

---

31. That method of relief would appear in accord with Maryland's general severability statute. 1 Md.Ann.Code art. 1, § 23 (1974 Cum.Supp.).